UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Jennifer Lawton


      v.                              Civil No. 11-cv-189-JD
                                Opinion No. 2012 DNH 126

Michael Astrue, Commissioner
Social Security Administration


O R D E R

    Jennifer Lawton seeks judicial review of the denial of her
application for Social Security Disability Benefits.  See 42
U.S.C. § 405(g).  Lawton contends that the administrative law
judge ("ALJ") incorrectly found that despite her severe
impairments due to ACL strain of the left knee, obesity, post-
traumatic stress disorder, and panic disorder, she retained the
residual functional capacity to perform light work with certain
additional limitations.  The Commissioner moves to affirm the
decision.  For the reasons that follow, the decision is affirmed.


Background

    The background information is taken from the parties' joint
statement of material facts, augmented, as necessary, by the
administrative record.  See LR 9.1(b).

Lawton filed an application for disability insurance benefits on June 30, 2009, alleging a disability that began on July 17, 2008, when she was thirty-five years old.  At that time, Lawton worked as a cook at a restaurant, Bagel Works, where she fell on a wet floor, injuring her hip and knee.  Her other past work included jobs as a waitress, a cook, a restaurant manager, a personal care assistant, and a production assembler at a factory.  At the time of her application, she was taking online college classes at Franklin Pierce University toward a Bachelor's Degree in criminal justice.

A. <u>Medical Records of Physical Impairments</u>

After the fall on July 17, 2008, Lawton was examined at Cheshire Medical Center by Dr. Karoline Kimball who noted a superficial abrasion on her left knee but no swelling or other deformity.  The x-ray was "perfect," showing no evidence of degenerative change or fracture.  Dr. Kimball assessed Lawton with a bruised left knee and a strained left hip.  Vicodin was prescribed for pain, and Lawton was given crutches.  During subsequent treatment visits, Lawton continued to report knee pain and continued to use crutches.  Dr. Kimball wrote in her medical notes that Lawton's complaints of tenderness and pain were "a

little over reactive." Dr. Kimball stated that Lawton "certainly could work doing a sit-down job only."

Lawton did physical therapy to strengthen her knee. On August 8, 2008, Dr. Kimball reported that an MRI of Lawton's knee showed evidence of an ACL strain. Dr. Kimball instructed Lawton to be more active and released her to work at her job at Bagel Works but only three to four hours each day. Because Bagel Works did not have light duty work Lawton could do, Dr. Kimball restricted her from working.

On August 29, 2008, Dr. Kimball referred Lawton to an orthopedic surgeon, Dr. Wade Penny. Lawton had a consultative examination with Dr. Penny on September 11, 2008. Dr. Penny concluded that Lawton's MRI scans and x-rays suggested a minor strain-type injury with very mild inflammation. On examination, Dr. Penny concluded that Lawton's bruise was not significant. He concurred with Dr. Kimball's opinion that Lawton was capable of sedentary work.

Lawton sought a second opinion from Dr. Shawn Harrington on September 16, 2008. Dr. Harrington also found no basis from his examination and Lawton's scans that would indicate chronic difficulty with her left knee. Dr. Harrington stated that Lawton could do sedentary full-time work. On October 3, 2008, Dr. Harrington reported that Lawton had improved and cleared her for

light duty work with certain limitations.  Dr. Harrington again
cleared Lawton for light duty work with certain restrictions on
October 31, 2008.  An MRI of Lawton's knee done on December 3,
2008, was negative except for a possible small increase in fluid
in the joint.  Dr. Harrington suggested injections for knee pain.
Dr. Harrington restricted Lawton to avoid kneeling, squatting,
and climbing and gave her a temporary limitation to standing and
walking for no more than thirty minutes each hour.  Her ability
to sit, reach, and drive was unrestricted.

In January of 2009, Lawton reported considerable improvement
and that she was looking for work.  Dr. Harrington stated that
Lawton could lift and carry weight at the light exertional level
and could frequently stand and walk.  She was limited in
kneeling, squatting, and climbing but not restricted in sitting,
bending, reaching, or driving.

Dr. Sachin Dave did a neurological examination on February
27, 2009, because of Lawton's complaints of numbness in her left
foot.  Lawton denied any symptoms or pain in her back, arms, or
her right leg.  On examination, Lawton had normal strength in her
left leg and foot muscles, normal reflexes, normal sensory
responses, and normal gait.  An additional test showed no
significant abnormalities.

Dr. Pamela Deberghes, examined Lawton on March 31, 2009, at Dr. Harrington's request, because of Lawton's continued complaints of pain in her left knee.  She noted that Lawton's complaints of pain were out of proportion to the minimal objective findings, suggesting that Lawton's pain might be exaggerated because of secondary gains.  She concluded that Lawton probably had patellar chondromalacia, which was exacerbated by her bruise and her obesity.[1]  Dr. Deberghes stated that losing weight might be the best option but also recommended arthroscopic surgery.

Lawton had arthroscopic surgery on her left knee with resection of the symptomatic medial plica on April 28, 2009.[2]  At her postoperative examination, Lawton complained of difficulty with pain control.  Dr. Ronald E. Michalak stated that Lawton's chronic use of narcotics for "benign musculoskeletal pain" had increased her tolerance for pain medication.  Although Lawton was walking without crutches or medication in May of 2009, in August of 2009 she reported to Dr. Harrington that she had global pain throughout her left leg.  Dr. Harrington found that Lawton's complaints of pain were out of proportion to his findings on

---

[1]Patellar chondromalacia is a pain syndrome related to the cartilage under the kneecap.

[2]The medial plica is part of the joint lining of the knee.

examination and stated that Lawton's obesity worked against her recovery.  On September 16, 2009, Lawton had a left lumbar nerve block and reported that she was doing better by October 1 although she continued to complain of left knee and hip pain.  X-rays and bone scans were normal.

In January of 2010, Dr. Yulan Wang, a pain specialist, prescribed a low dose of Hydrocodone, a pain medication, and a trial of Topamax, a medication used to treat seizures.  An MRI done on March 10, 2010, of Lawton's hip produced normal results, and a radiological examination of her left ankle in April showed that her ankle was normal.

Dr. Burton Nault, a state agency consultant, reviewed Lawton's medical records on October 21, 2009.  Dr. Nault assessed Lawton's residual functional capacity in light of Lawton's knee problem and obesity since July 17, 2008.  He concluded that Lawton could lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; that she could stand or walk for about six hours during an eight-hour work day, and that she could sit for about six hours in an eight-hour work day.  Dr. Nault found no other limitations.

On August 26, 2010, Joan Van Saun, a licensed occupational therapist, did a functional capacity evaluation of Lawton.  Van

Saun concluded that Lawton could only do part-time sedentary work
and could not return to her job as a cook at Bagel Works.

    B.  <u>Medical Evidence of Mental Impairments</u>

    Lawton had an appointment with her primary care provider on
July 7, 2008, for assessment of her mood symptoms.  Lawton
discussed having felt depressed for years and the sources of
stress in her life.  The nurse practitioner suggested
psychotherapy and prescribed medication for depression and
anxiety.

    On October 13, 2009, Lawton had a consultative examination
done by Richard W. Root, Ed.D., to assess her anxiety.  Root
concluded that Lawton experienced post traumatic stress disorder
("PTSD"), panic attacks with agoraphobia, and a mood disorder
related to her knee problem.  Root found that Lawton's
impairments did not impact her ability to perform activities of
daily living, allowed her to remember simple instructions and to
concentrate on and complete normal work tasks.

    Nicholas Kalfas, Ph.D., completed a Psychiatric Review
Technique form on October 20, 2009, based on his review of
Lawton's records pertaining to mental impairment.  Dr. Kalfas
concluded that Lawton's mood disorder, PTSD, and panic disorder
with agoraphobia caused a mild degree of limitation in Lawton's

daily activities and her ability to maintain concentration,
persistence, or pace.  Her impairments caused a moderate degree
of limitation in her ability to maintain social functioning.  Dr.
Kalfas concluded that Lawton was able to understand, remember,
and carry out simple instructions; to maintain attention and
complete a normal work week; to make simple work decisions; and
to interact appropriately with peers and supervisors.  Dr. Kalfas
also noted that Lawton could adapt to a work setting when
supervisors were not overly critical and when she could avoid the
general public and large groups of people.

From November 5, 2009, to June 29, 2010, Lawton was treated
at Antioch Psychological Services Center.  The final diagnosis
made there was PTSD.  Lawton was assessed as having a Global
Assessment of Functioning ("GAF") score of 50.[3]

Lawton began treatment with Dr. Pamela Olsson on April 5,
2010, for management of her medication to address psychological
symptoms and sleep problems.  On September 1, 2010, Dr. Olsson
completed a "Medical Source Statement of Ability to Do Work-
Related Activities (Mental)."  Dr. Olsson indicated that Lawton
had no limitation in her ability to understand, remember, and

---

[3]A GAF score of 50 or below indicates serious impairments in
social and occupational functioning.  See Pate-Fires v. Astrue,
564 F.3d 935, 944 (8th Cir. 2009).

carry out simple instructions; mild limitations in her ability to make judgments and simple work decisions; and moderate limitation in her ability to understand, remember, and carry out complex instructions.  Dr. Olsson also assessed Lawton with moderate limitations in her ability to interact with the public, supervisors, and coworkers and to respond appropriately to work situations.

C.  Administrative Process and Decision

A hearing was held before an ALJ on October 8, 2010.  Lawton was represented by counsel and testified at the hearing.  A vocational expert also testified.  Lawton testified that she was thirty-seven years old and was a college sophomore taking online classes toward a degree in criminal justice through Franklin Pierce University.

Lawton described her daily activities as follows.  On a typical day, she would wake at 5:00 a.m., put ice on her lower back and her knee, wake her thirteen-year old son, lie down, watch a movie, and soak in the bathtub.  During the remainder of the day, she would attend therapy appointments, apply more ice, and occasionally use her computer.  As to daily chores, Lawton explained that she tried to wash dishes and do laundry but she also got help from her son and her mother.  She said that she

could only sit, stand, or walk for fifteen minutes at a time and that she took Ativan three times a day which made her tired.  She testified that her symptoms due to PTSD and anxiety had worsened over the past year.

The vocational expert provided opinions about available work in response to three hypothetical questions posed by the ALJ. The first posed a woman who could do work at the light exertional level, had limited use of her hands and feet to operate push and pull controls, and no other limitations.  The vocational expert stated that person could do Lawton's past work as a production assembler, waitress, and short-order cook, along with other jobs such as an electronics worker or a production worker.  In the second hypothetical, the ALJ added mild impairment in making simple decisions and judgments and moderate impairment in complex understanding; memory; interacting with the public, supervisors and coworkers; and in responding to usual workplace situations. The vocational expert responded that she could still do her past work and the other work he had identified.  In the third hypothetical, the person could lift no weight to waist level, could lift eight pounds above her waist, could carry ten pounds, could push and pull two pounds, could occasionally stand and walk for fifteen minutes, could sit for thirty minutes, and could never or rarely do postural activities.  She could do sedentary

work only part time. In response, the vocational expert said that the part-time restriction ruled out all full-time work so that she could not do any occupation.

Lawton's counsel asked the vocational expert to consider additional limitations of being able to sit, stand, or walk for only fifteen minutes at a time. The vocational expert responded that she would need a job with a sit or stand option, which would preclude Lawton's past work. Counsel then asked the vocational expert to consider an anxiety disorder that would cause distractions and difficulty with focus. The vocational expert asked counsel to rephrase the question in terms of a percentage of the day in which the person would be unable to focus or concentrate. Counsel said the person would not be able to focus for more than fifteen minutes at a time. The vocational expert responded that impairment would limit the ability to work.

The ALJ issued a decision on November 23, 2010, in which he found that Lawton had severe impairments due to ACL strain of the left knee, obesity, PTSD, and panic disorder with agoraphobia. He found that Lawton had the residual functional capacity to perform light work with moderate limitations in her ability to interact appropriately with the public, accept instructions, respond appropriately to criticism from supervisors, and respond appropriately to changes in the work settings. He also found

11

that she could understand and carry out instructions, maintain
attention for extended periods, complete a normal work week, make
simple work-related decisions, and deal appropriately with
supervisors and peers.  Based on those findings, the ALJ
concluded that Lawton could return to her past work as a
production assembler, waitress, and short-order cook.  As a
result, the ALJ found that Lawton was not disabled.  When the
Decision Review Board did not complete its review within the time
allowed, the ALJ's decision became the decision of the
Commissioner.

<u>Standard of Review</u>

     "Judicial review of a Social Security claim is limited to
determining whether the ALJ used the proper legal standards and
found facts upon the proper quantum of evidence."  <u>Ward v. Comm'r
of Social Security</u>, 211 F.3d 652, 655 (1st Cir. 2000) (citing
<u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999)).  The court
defers to the ALJ's factual findings as long as they are
supported by substantial evidence, even if other evidence would
support a different conclusion.  § 405(g); <u>Tsarelka v. Sec'y of
Health & Human Servs.</u>, 842 F.2d 529, 535 (1st Cir. 1988).
"Substantial evidence is more than a scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate

12

to support a conclusion." <u>Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev.</u>, 620 F.3d 62, 66 (1st Cir. 2010).

## Discussion

The ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  The claimant bears the burden, through the first four steps, of proving that her impairments preclude her from working.  <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001). At Step Five, the burden shifts to the Commissioner to show that jobs exist in the relevant economies that the claimant can perform.  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001). All five steps are not applied to every claimant, as in this case, where the evaluation ended at Step Four.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987); <u>Freeman</u>, 274 F.3d at 608.

Lawton challenges the ALJ's conclusion that she is capable of doing her past work on a variety of grounds, which are neither clearly stated nor well developed.  In response, the Commissioner argues that because Lawton failed to develop arguments to support her motion, she has waived any alleged errors that she might have raised for review.  Alternatively, the Commissioner interpreted Lawton's motion to raise nine errors in the ALJ's findings at

13

Step Two, Step Three, and Step Four and addressed those matters. Lawton did not respond to the Commissioner's motion to affirm.

A. Waiver

As is noted above, it is the claimant's burden to prove that she was disabled through the first four steps of the sequential evaluation. Freeman, 274 F.3d at 608.  When presented with an inadequate motion to reverse the Commissioner's decision, it is not the court's job to create and develop arguments to support the motion.[4]  Lovern v. Astrue, 2011 WL 4621455, at *6 (D. Mass. Sept. 26, 2011) (citing Shaner v. Chase Bank USA, 587 F.3d 488, 494 (1st Cir. 2009), and United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)); Tarantino v. Astrue, 2011 WL 1540207, at *4 (D. Mass. Apr. 19, 2011) ("[Pro se] Plaintiff's failure to make any argument is reason enough to deny his motion to reverse and, concomitantly, allow the Commissioner's motion to affirm."); Nelson ex rel. S.N. v. Astrue, 2010 WL 3081690, at *11 n.5 (D. Mass. Aug. 6, 2010); Flannery v. Chater, 1996 WL 636127, at *2 (D.N.H. Sept. 26, 1996).

Lawton lists one "general issue," which is whether the ALJ erred "by finding a residual functional capacity for the

---

[4]As is noted above, Lawton is represented by counsel.

plaintiff to return to past relevant work."  In the argument section that follows her statement of the issue, Lawton provides a rambling and undeveloped discussion of a variety of issues. Despite the shortcomings of Lawton's motion and memorandum, the court will address the issues raised, to the extent that is possible, following the sequential order provided by § 404.1520.

B.   Sequential Evaluation

Section 404.1520 provides a five-step sequential evaluation to determine whether a claimant is disabled.

1.   Step One

The ALJ found at Step One that Lawton had not engaged in substantial gainful activity since her alleged onset date of July 17, 2008.

2.   Step Two

At step two, the ALJ considers the "the medical severity of [the claimant's] impairment(s)."  § 404.1520(a)(4)(ii).  To provide a basis for a disability determination, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" unless the impairment "is expected to result in death."  § 404.1509.  A claimant will be found not

disabled at Step Two if she does not have an impairment or a combination of impairments that is severe.  § 404.1520(a)(4)(ii).

The ALJ found that Lawton had severe impairments due to ACL strain of the left knee, obesity, PTSD, and panic disorder with agoraphobia.  Lawton asserts that she also had a severe impairment due to Reflex Sympathetic Dystrophy Syndrome or Complex Regional Pain Syndrome ("RSDS/CRPS") that was diagnosed by her neurologist, Dr. Theodore Ruel, and she cites Exhibit 23F.[5]  She contends that the ALJ failed to follow the policy guidelines for assessing RSDS/CRPS that are provided in SSR 03-2p and erroneously failed to give Dr. Ruel's opinions controlling weight as provided in SSR 96-2p.

Lawton did not mention Dr. Ruel in the joint statement of material facts.  The plaintiff is required to "describe all facts pertinent to the decision of the case and all significant procedural developments" in the joint statement.  LR 9.1(b)(2).  Therefore, by failing to include Dr. Ruel's treatment and diagnosis in the joint statement, Lawton likely has waived any argument based on those records.

_____

[5]Exhibit 23F consists of sixteen pages of office treatment notes from Cheshire Medical Center, most of which are not Dr. Ruel's notes.  Lawton also cites page 935, stating that Dr. Ruel's diagnosis is consistent with the findings there.  Page 935 is a copy of a Workers' Compensation Form, dated February 15, 2010.

Even if the matter were not waived, because Lawton bears the
burden of proof at Step Two, "including the burden to demonstrate
the degree of functional limitation resulting from [her]
impairments, an error in describing a given impairment as non-
severe at step 2 is considered 'harmless,' unless the claimant
can demonstrate that the error proved outcome determinative in
connection with the later assessment of [her residual functional
capacity]." Fernald v. Social Sec. Admin. Com'r, 2012 WL
1462036, *2 (D. Me. Apr. 19, 2012) (citing cases).  As long as
the ALJ found at least one severe impairment so that the
sequential evaluation progressed to the next step, an error at
Step Two does not require reversal.  Hines v. Astrue, 2012 WL
1394396, *12-*13 (D.N.H. Mar. 26, 2012) (citing cases).
Therefore, to the extent Lawton challenges the ALJ's findings at
Step Two, her motion fails on that issue.

     3.  Step Three
     At Step Three, the ALJ determines whether the claimant's
impairment or combination of impairments meets or equals one of
the Listings at Part 404, Subpart p, Appendix 1.
§ 404.1520(a)(4)(iii).  To meet a Listing, the claimant must show
that her impairment or combination of impairments "satisfies all
of the criteria of that listing, including any relevant criteria

17

in the introduction, and meets [twelve-month] durational requirement." § 404.1525(c)(3).  In the alternative, a claimant will be found disabled if the impairment or combination of impairments equals a Listing meaning that "it is at least equal in severity and duration to the criteria of any listed impairment." § 404.1526(a).  The claimant bears the burden of showing that her impairment or combination of impairments meets or equals a listed impairment.  Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 793 (1st Cir. 1987).

The ALJ found that Lawton's combination of psychological impairments did not meet or equal Listing 12.06, which relates to anxiety disorders.  Lawton does not challenge that finding but instead contends that the ALJ erred in failing to find that her impairment due to PTSD meets Listing 12.04.[6]

Listing 12.04 pertains to affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are

_____

[6]In the same paragraph, Lawton also states that the ALJ failed to consider the combined effect of her physical and mental impairments, but that statement appears to be a general summary rather than part of the issue pertaining to the Step Three finding.

satisfied." Listing 12.04.  In support of her claim, Lawton cites the Termination Summary prepared by John Lynch who met with Lawton for psychological therapy sessions and repeats, verbatim, some of the requirements for Parts A and B of Listing 12.04.

Lawton does not explain how Lynch's Termination Summary shows that she meets the criteria of Listing 12.04.  Notably, Lynch did not make any finding that Lawton had "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome" as is required to meet the criteria for Listing 12.04. Further, Lynch's summary does not include findings, as required by Part B, that she had marked restrictions in specific functions.  In contrast, as the ALJ explained, neither Dr. Olsson nor Dr. Kalfas found that Lawton had marked restrictions in functioning.

Therefore, Lawton has not met her burden to show that she met Listing 12.04, eliminating her claim that the ALJ erred in failing to find her disabled at Step Three.

### 4.   Step Four

At Step Four, the ALJ makes a finding as to the claimant's residual functional capacity and whether, based on the residual functional capacity assessment, the claimant can return to her past relevant work.  § 404.1520(a)(4)(iv).  In this case, the ALJ

found that Lawton had the residual functional capacity to perform work at the light exertional level with certain limitations in her ability to cope in a work setting.  Specifically, the ALJ found that Lawton had moderate limitations in her ability to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting.  He further found that Lawton could understand, remember, and carry out instructions; maintain attention for extended periods; complete a normal work week; make simple work related decisions; deal with changes in a routine work setting; and interact appropriately with peers and supervisors.  He also found that with those limitations, Lawton could accommodate changes in her work setting and could generally understand and remember enough for most employment situations.  Based on that residual functional capacity and the vocational expert's testimony, the ALJ found that Lawton could return to her past work as a production assembler, waitress, and short-order cook.

Lawton contends that the ALJ erred in the residual functional capacity assessment and that the error means that the finding that she could return to her past work is unsupported by substantial evidence.  She argues, in skeletal form, that the ALJ erred in the weight he gave to the opinions of Dr. Olsson and Dr.

Kalfas and failed to assess the medical opinions under the
guidelines provided by SSR 96-2p; erred in assessing her daily
activities for purposes of determining her residual functional
capacity; erred in failing to consider the effects of RSDS/CRPS,
as diagnosed by Dr. Ruel, under the guidelines provided in SSR
03-2p; and erred in failing to find that the extent of her
psychological impairments caused her to be disabled as was found
in Moriarty v. Astrue, 2008 DNH 158, 2008 WL 4104139 (D.N.H. Aug.
29, 2008).

> a.  Medical opinions

Lawton contends that the ALJ gave too much weight to the
opinion of Dr. Kalfas, a state agency consultant psychologist,
and too little weight to the opinion of Dr. Olsson, one of her
treating physicians.  The ALJ attributes weight to a medical
opinion based on the nature of the relationship between the
medical source and the claimant, the extent to which the opinion
includes supporting information, the consistency of the opinion
with the record as a whole, the specialization of the source, and
other factors, including the source's understanding of the
administrative process and the source's familiarity with the
claimant's record.  § 404.1527(d); see also SSR 96-2p, 1996 WL
374188 (July 2, 1996).  An ALJ gives weight to an opinion of a

state agency consultant based on the relevant criteria used in §
404.1527(d).

In this case, the ALJ discussed the opinions of Dr. Kalfas
and Dr. Olsson and gave weight to both.  As the Commissioner
points out, their opinions are not materially different.  Lawton
does not explain why the ALJ's reliance on Dr. Kalfas's opinion
was error.  Therefore, Lawton provides no basis to reverse the
decision based on the ALJ's evaluation of the medical opinions.

### b.  Daily activities

Lawton asserts that the ALJ erred in considering her daily
activities for purposes of determining her residual functional
capacity.  She contends that the activities the ALJ considered
were things she could do only on "a sporadic basis."  Lawton does
not specify what activities she objects to or where in the
decision the error occurred.

For purposes of assessing residual functional capacity, an
ALJ must evaluate "the intensity and persistence of [a
claimant's] symptoms, such as pain, and determin[e] the extent to
which [the claimant's] symptoms limit [her] capacity for work . .
. ." § 404.1529(c).  Factors that an ALJ considers as relevant to
the severity and persistence of a claimant's symptoms include the
claimant's daily activities.  § 404.1529(c)(3)(I); see also Avery

<u>v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 28-29 (1st Cir. 1986).

In the section of the decision pertaining to residual functional capacity, the ALJ recounted Lawton's activities as she described during her testimony at the hearing.  Because Lawton does not identify which of the listed activities she could do only sporadically, her claim of error is insufficient for review.

      c.   <u>RSDS/CRPS</u>

As is noted above in the discussion of the ALJ's findings at Step Two, Lawton likely waived review of the ALJ's analysis of Dr. Ruel's opinion due to her failure to include any facts pertaining to Dr. Ruel in the joint statement of material facts. Further, as the Commissioner contends, Lawton's argument pertaining to Dr. Ruel's opinion is not sufficiently developed. To the extent the issue can be addressed, however, Lawton has not shown reversible error.

The ALJ addressed Dr. Ruel's opinions as part of his Step Two evaluation.  The ALJ noted the diagnosis of RSDS/CRPS and that Dr. Ruel indicated that Lawton was unable to work.  The ALJ found, however, that Dr. Ruel's treatment notes did not support that assessment and noted that Dr. Ruel's neurological assessments of Lawton have been unremarkable.

In support of her claim of error, Lawton states that she was diagnosed with RSDS/CRPS by Dr. Ruel.  She also states that Dr. Ruel's diagnosis is consistent with his finding that she could not return to work.  She criticizes the ALJ's statement that Dr. Ruel's treatment notes showed that her neurologic examinations have invariably been unremarkable.  Lawton repeats, without attribution, part of the section of SSR 03-2p titled "What is RSDS/CRPS?", without explaining its relevance to her case.

Dr. Ruel's examination note dated February 15, 2010, states: "Jennifer is here for consultative evaluation regarding her diagnosis of reflex sympathetic dystrophy.  I have seen her on a number of occasions over the past 15 years for a variety of pain-related conditions.  Her neurologic examination has invariably been unremarkable."  Dr. Ruel noted that he strongly advised against narcotic medication, that he encouraged a therapeutic exercise program, and that he could not offer a cure for her condition.  Therefore, Dr. Ruel's office note supports the ALJ's interpretation.

d.  Effects of psychological impairments

Lawton cites Moriarty v. Astrue, 2008 DNH 158, to support her assertion that her PTSD in combination with other disorders caused her to be disabled.  In Moriarty, however, the ALJ found

24

no severe impairments at Step Two, despite record evidence supporting a medically determinable impairment, and the case was remanded for a determination of whether the claimant was then disabled, and if so, a determination of the onset date. 2008 WL 4104139 at *3-*8. Lawton has not shown that Moriarty is pertinent to the issues in this case.

### 5. Step Five

If a claimant is found to be unable to return to her past relevant work at Step Four, the ALJ moves on to Step Five to determine whether she can make an adjustment to other work. § 404.1520(a)(4)(iv). The burden shifts to the Commissioner to show that there is work the claimant can do in the relevant economies. Seavey, 276 F.3d at 5. As is noted above, the ALJ need not complete all five steps of the sequential evaluation if the claimant is found to not be disabled at Step Four. See, e.g., Brown v. Apfel, 71 F. Supp. 2d 28, 34 (D.R.I. 1999) (describing sequential evaluation process).

The ALJ found, at Step Four, that Lawton could return to her past work and did not make any finding at Step Five. In the context of making a residual functional capacity assessment, the ALJ discussed Lawton's ability to do sedentary work and noted that jobs existed that she could do at that level. The

25

disability determination, however, was not made at Step Five. Therefore, Lawton's arguments pertaining to Step Five are inapposite.

Conclusion

For the foregoing reasons, Lawton's motion to reverse and remand the Commissioner's decision (document no. 12) is denied. The Commissioner's motion to affirm (document no. 15) is granted.

The Clerk of Court shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph A. DiClerico, Jr.
United States District Judge

July 24, 2012

cc:  Robert J. Rabuck, Esquire
     John A. Wolkowski, Esquire